United States District Court
Southern District of Texas

**ENTERED**

May 07, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MARTHA SUSANA SANDEL-GARZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-CV-128 |
| | § | |
| BBVA COMPASS BANCSHARES, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM AND ORDER**

Plaintiff Martha Susana Sandel-Garza, a former employee of Defendant BBVA

Compass Bank, brought this action against her former employer after her

termination, alleging age and disability discrimination in violation of federal and

state law.  BBVA now moves for summary judgment (Dkt. No. 37).  Having carefully

considered the parties' arguments, the record, and the applicable law, the motion is

**GRANTED in part and DENIED in part**.  Because Plaintiff has not provided

evidence of age discrimination, summary judgment on that claim is **GRANTED**.

Plaintiff has, however, demonstrated genuine issues of material fact as to whether

BBVA failed to reasonably accommodate her disability and terminated her because

of it.  Summary judgment on Plaintiff's disability discrimination claims is **DENIED**.

**I. BACKGROUND**

**A. Plaintiff's request for medical leave is approved.**

BBVA is an Alabama-headquartered bank with over 600 branches (Dkt. No.

37-3 at 2).  In 2003, Plaintiff began work at BBVA's University Branch in Laredo,

Texas, as a bank teller (Dkt. No. 41-1).[1]  A few years later, she was promoted to Financial Service Advisor, which involved marketing "retail banking products and services to consumers" (Dkt. Nos. 37-3 at 4; 37-4 at 41).  Plaintiff reported to Mario Cantu, the University Branch Manager, and maintained a good performance record throughout her employment (Dkt. Nos. 37-3 at 19; 37-7 at 33; 41-31 at 15).

In early 2017, Plaintiff was diagnosed with breast cancer.  She requested medical leave, and her doctor submitted a Certification of Health Care Provider, which outlined her diagnosis and anticipated treatment (Dkt. No. 37-4 at 67–70, 73).  Plaintiff would need several surgeries followed by radiation treatment and endocrine therapy (*id.* at 73).  Her "estimate[d] … period of incapacity" was from May 23, 2017 to November 23, 2017 (*id.* at 74).

BBVA contracts with ADP, a third-party vendor commonly known as 'BBVA Leave Administration,' to administer the bank's leave-of-absence process (Dkt. No. 37-3 at 3).  If a leave request is approved by ADP, it is also approved by BBVA, and employees may rely on a decision made by ADP "just the same as if it came directly from the bank" (Dkt. No. 37-2 at 7; *see also id.* at 42).  ADP approved Plaintiff's request for three months of FMLA leave followed by three months of non-FMLA leave (Dkt. No. 37-5 at 2).[2]

---

[1] Plaintiff was hired by the Laredo National Bank, which was subsequently acquired by Compass Bank.  In 2019, Compass changed its name to BBVA Compass (Dkt. No. 37-3 at 2, 3).

[2] In accordance with the Family and Medical Leave Act of 1993 (FMLA), BBVA allows qualifying employees to take three months of job-protected leave per year (Dkt. No. 37-4 at 33).  After an employee exhausts FMLA leave, she may transition onto non-FMLA, or "company," leave, during which time BBVA "may fill [the employee's] position due to business necessity" (Dkt. Nos. 37-2 at 36–37; 37-3 at 3).

Unable to return when her leave was set to expire, Plaintiff requested about a six-week extension from November 24, 2017 to January 3, 2018 (Dkt. No. 37-5 at 18). Plaintiff's doctor submitted another certification to that effect (*id.* at 43–46). Because the doctor's paperwork was missing information, ADP "pended" Plaintiff's request and later denied it (Dkt. Nos. 37-5 at 48–50; 37-6 at 2–3).

On January 3, 2018, Plaintiff's doctor submitted a revised certification listing the following day, January 4, as the end of Plaintiff's period of incapacity (Dkt. No. 41-8 at 1–4).   On January 8, 2018, the doctor submitted a Return to Work Certification, which "released [Plaintiff] to regular duty with NO restrictions" (Dkt. No. 37-6 at 26–28; *see also* Dkt. No. 41-23).   On January 15, 2018, ADP retroactively approved Plaintiff's leave request through January 8 (Dkt. Nos. 37-6 at 36–37; 37-8 at 64, 70–71).[3]   The approval notice stated, "If you have received a previous leave status notification …, this notice will supersede the previously communicated information" (Dkt. No. 37-8 at 64).

## B. While Plaintiff is on leave, BBVA fills her position.

Meanwhile, in August 2017, Cantu emailed Tasha Hardy, the H.R. Partner[4] assigned to the University Branch, for an update on Plaintiff's return date (Dkt. No. 37-5 at 10).[5]   Hardy responded that Plaintiff was on leave until November 23, 2017 but had "exhausted her FMLA (job protection)" (Dkt. No. 37-5 at 9).   Cantu's

---

[3] ADP is authorized to approve leave requests retroactively (Dkt. No. 37-2 at 9).

[4] A Human Resources Representative at BBVA is called a Talent and Culture Partner.   For convenience, the Court will refer to them as "H.R. Partners."

[5] While Cantu could recommend personnel decisions, he could not hire or fire an employee without approval from H.R. (Dkt. Nos. 37-3 at 4, 37-7 at 15).

supervisor, District Manager Frank Gallegos, wrote back, "The fact that … job protection is exhausted, what do we need to do to replace her?" (*id.*).

Hardy asked Cantu for an "email detailing how [Plaintiff's] absence is causing a business hardship to the branch," explaining that if BBVA was "unable to accommodate [Plaintiff's] additional leave, [Cantu] will need to explain how this would cause a business hardship." Hardy cautioned, "[W]e have to consider [the] ADA, which could also offer job protection" (Dkt. No. 37-5 at 8).

Cantu sent Gallegos a rough draft of the email he planned to send Hardy (Dkt. Nos. 37-5 at 4; 37-7 at 19). After receiving Gallegos's edits, Cantu sent a longer email to Hardy that described the personnel shortage at the University Branch (Dkt. Nos. 37-5 at 7–8; 37-7 at 19). On September 28, 2017, Hardy approved Gallegos and Cantu's request to post Plaintiff's position. Hardy also wrote:

> Please note that [Plaintiff] will remain as an employee of the bank and will remain in her PCN [employee number]. If she should be released to return to work after the position has been filled, then we will need to work with her about finding a new position

(Dkt. No. 41-5 at 7). After posting Plaintiff's position on its website, BBVA promoted Alexandro Carbajal, a current University Branch employee. Carbajal began his new job as a Financial Service Adviser on December 3, 2017 (Dkt. Nos. 37-2 at 46; 37-5 at 32).[6]

---

[6] Based on Hardy's email, Cantu did not believe that Carbajal had permanently replaced Plaintiff or that Plaintiff had been terminated (Dkt. No. 37-7 at 24).

### C. On January 5, 2018, H.R. Partner Jennifer Polnett removes Plaintiff's name from BBVA's computer system, effectively terminating her.

After Carbajal's promotion, confusion arose because Plaintiff and Carbajal were assigned the same employee number or "PCN."  For instance, Gallegos asked H.R. Partner Ronnie Moore to assign a different PCN to Carbajal, who was "an add to staff, because of [Plaintiff's] FMLA situation" (Dkt. No. 37-6 at 15).  Moore relayed Gallegos's request to Gery Hackney in Corporate Finance (*id.* at 12), who responded that both the position and its associated PCN were assigned to Plaintiff (*id.* at 13).  Hackney wrote, "If Staff Management will consent to the replacement of [Plaintiff] by [Carbajal] I'll be glad to reassign the officer number" (*id.*).  Michael Glidewell in Staff Management wrote to Sales Productivity Executive Guillermo Martinez, "You have a double filled PCN here. Who is leaving and when?" (*id.*).  Martinez circled back to Gallegos, asking for "updates regarding [Plaintiff's] status" (Dkt. No. 41-14 at 7).

On January 3, 2018, as noted, Plaintiff's doctor submitted a revised certification (Dkt. No. 41-8 at 1–4).  On January 4, Plaintiff advised Cantu that she was ready to come back to work; Cantu told her to "contact H.R. to get clearance" (Dkt. No. 41-14 at 7).  On January 5, around 8:00 a.m., Cantu emailed Gallegos about his conversation with Plaintiff (*id.*).  Around 1:45 p.m., H.R. Partner Christy Velez emailed H.R. Partner Melissa Edwards, "Can we find out if [Plaintiff] is coming back and is her job protected?  We are now having issues with getting [Carbajal] his officer number since they are both sitting in the same PCN" (Dkt. No. 37-6 at 11).  Around 2:30 p.m., H.R. Partner Jennifer Polnett emailed Edwards, "[Plaintiff] reached 180

days and went to [short-term disability] without pay.  Please process her out of the system in Netprofile" (Dkt. No. 41-15).[7]

In her deposition and subsequently drafted declaration, Polnett averred that BBVA has a general policy of terminating employees on leave for 180 days (Dkt. Nos. 37-2 at 11–12, 15–20; 37-3 at 3).  Polnett could not identify how the policy was communicated to employees (Dkt. No. 37-2 at 21) or where the policy was written down (Dkt. No. 37-2 at 15–16).[8]  Plaintiff was terminated about two months after she reached 180 days.  Polnett speculated that the delay might have been due to the holiday season, but she could not remember why she chose January 5 to terminate Plaintiff (*id.* at 19–20).

### D. Plaintiff tries to return to work, which leads to more confusion about whether she still has a job.

Polnett did not apparently tell anyone that she had terminated Plaintiff's employment, and emails continued to circulate regarding the PCN issue.  For instance, Gery Hackney wrote that he had "held out until now" on reassigning Plaintiff's PCN to Carbajal, and sought clarification from someone in authority (Dkt. No. 41-14 at 10–11).[9]

---

[7] Netprofile is the "system that departments use to process [employees] out of the system if they are terminated" (Dkt. No. 37-2 at 12).  Polnett is not authorized to put information into Netprofile, but she may ask other H.R. Partners, like Edwards, to do so (*id.* at 21).

[8] Polnett referenced an unrelated section of the employee handbook that deals with payout of unused sick days (Dkt. Nos. 37-2 at 15–16 (deposition); 37-4 at 28 (handbook)).

[9] Specifically Hackney wrote, "If there is an incentive issue... someone with the authority over such matters needs to tell me if making the substitution is OK from a[n] Incentive perspective.  If there is a staffing reason for not reassigning the Officer# … I need a Staffing authority to decide if a re-assignment is appropriate" (Dkt. No. 41-14 at 10–11).

In a follow-up email, Guillermo Martinez recalled that Plaintiff had already told her branch manager that she was ready to return. He noted that Gallegos planned to discuss Plaintiff's situation with H.R. by the following Monday and advised everyone not to act until H.R. "confirms the next steps" (*id.* at 10). Hackney agreed to "await further instructions from the proper authority" and, in the meantime, "restored" the disputed PCN to Plaintiff (*id.* at 9).[10] On January 7, Gallegos emailed H.R. Partner Melanie Sparks that he was thinking about transferring Carbajal to another branch because Plaintiff was "in full remission and ready to come back" (Dkt. No. 41-17 at 1).

Yet on January 8, the same day Plaintiff's doctor submitted a medical release, H.R. finished processing her Netprofile termination (Dkt. No. 37-6 at 19). Unaware that she had been terminated, Plaintiff continued to contact Cantu about her return date (Dkt. No. 41-18 at 3). Cantu emailed Melanie Sparks that, according to Plaintiff, ADP had told her she could return to work (*id.*). Sparks forwarded Cantu's email to Polnett and wrote, "HELP! Can you tell me if this is correct or not" (Dkt. No. 37-6 at 31). Polnett responded, "She has been released from the doctor. But her FMLA expired and she would need to apply for another position, correct?... [S]he would need to speak with her [H.R.] Partner to see if she still has her position" (*id.* at 30).

On January 15, after ADP retroactively approved her leave request, Plaintiff emailed Cantu to express concern over the delay.

---

[10] Similarly, Melissa Edwards emailed Christy Velez, "I have just terminated [Plaintiff] in the system, effective 01-05-18" (Dkt. No. 41-14 at 1). Velez responded, "[Plaintiff] is not coming back[?] [T]hey said she called the center and said she could come back?" (*id.*).

> When I called ADP …, they told me that my release was
> approved as of January 10, 2018 … [and] that all I had to
> do was show up to work.  The last time I spoke with you,
> you told me that H.R. had to put me "back in the system."
> You also told me that I still had my job to return to.  So far,
> I have not heard anything from anyone regarding when I
> can go back to work…. I'm [ ] getting very worried, and
> wondering if there is something wrong?

(Dkt. No. 37-6 at 46).  Cantu responded that Plaintiff's return "still need[ed] to be

approved by H.R."  He advised her to "feel free to contact H.R. as [he] suggested

previously" (*id.* at 55).[11]

On January 17, Sparks emailed Cantu, Gallegos, and Operations Manager

Julian Magana:

> I now know what's going on.  According to the records that
> I have found, effective 01/05/2018, [Plaintiff] was removed
> from the company's system (the code was failure to return
> from leave)…. So [she] will have to be hired back in order
> to return.  I'll talk with her, get a doctor's return note and
> then we can get her back to the job

(*id.* at 53).  On January 23, still unaware that she had been terminated, Plaintiff

emailed Sparks about her efforts to return to work.

> I called my branch manager, Mario Cantu, and he said that
> he would contact me after [he] contacted H.R.  I did not
> hear anything for several days, so I sent him an email, and
> he replied that I had to contact H.R., so I asked for the
> name of the person in another message, and he did not
> reply.  I did not hear anything from H.R., or my branch,
> until you left a message for me last week.  I have tried to
> contact you, but every time I call it goes to your voicemail.
> I would really appreciate your help with this matter, as I'm
> willing to return to work as soon as possible

---

[11] Gallegos and Cantu continued to behave like they expected Plaintiff to return.  Gallegos
asked Sparks to "reach out to [Plaintiff], so that we may hopefully expedite her return date" (Dkt. No.
41-19 at 1), and Cantu included her on the schedule for the following week (Dkt. No. 41-20 at 6).

(Dkt. No. 41-22 at 1).

On January 24, Sparks wrote back, "If you have your return to work paperwork completed for ADP and a return to work note, you can come back to work" (*id.*). Plaintiff replied that ADP had already approved her return based on her doctor's release, so she did not understand why Cantu was insisting on approval from H.R. (*id.*).  After receiving Plaintiff's email, Sparks wrote to Polnett, "Is this employee approved to return to work?" (Dkt. No. 41-9).  Without answering Sparks's question, Polnett replied, "ADP received a release to return to work for her on 1/8/2018 with a release date of 1/9/2018.  Let me know if you have any other questions" (Dkt. No. 41-23).  Based on Polnett's response, Sparks informed Cantu that Plaintiff could "return immediately" (*id.*).

About two hours later, however, Sparks emailed Cantu, Gallegos, and Magana again.

> I forgot [Plaintiff] was terminated off the system for failure to return from leave. We have to jump that hurdle first[ ] but as long as she returns within 180 days of being termed (term date was 01/05) she won't have to go through the drug test and background check.  So getting her onboarded will go a lot quicker

(Dkt. No. 41-24 at 1).  Sparks then sent back-to-back emails to H.R. Partner Christy Velez.  First, Sparks wrote that Plaintiff had been "terminated off the system on 1/5/18 for not coming back from leave but she has been released to return.  Can you hire her back into her same job?" (Dkt. No. 41-25).  About 20 minutes later, Sparks wrote, "Please disregard my last email…. [Plaintiff] has already been terminated for

failure to return from leave, AND according to the manager, her job was filled" (Dkt. No. 41-26 at 1).[12]

Finally, Sparks emailed Plaintiff, informing her for the first time that she had been terminated.  Sparks wrote, "I … was unaware that your position was filled after your job protected leave had been exhausted.  This is the reason you are no longer showing on the company's systems as an active employee."  Sparks advised Plaintiff that if she wished to apply for another position at BBVA, "getting back onboard will likely go quickly since you would be returning within 180 days" (*id.* at 1–2).[13]

### E. After learning of her termination, Plaintiff applies for two other positions at BBVA; she is treated as an external candidate.

BBVA policy provides that an employee whose position is filled while she is on non-FMLA medical leave is responsible for applying to any other positions that she is qualified for (Dkt. Nos. 37-2 at 36–37, 49; 37-3 at 3).  If an employee does not find a position within 30 days of her return-to-work date, her employment "will be terminated at that time" (Dkt Nos. 37-2 at 37, 41; 37-5 at 20; 37-6 at 37; *see also* 37-3 at 3).[14]  On January 2, 2018, BBVA posted an opening for a Financial Service

---

[12] Earlier that day, however, Gery Hackney assigned Carbajal a new PCN so Carbajal and Plaintiff no longer had the same number (Dkt. No. 41-14 at 8).

[13] On January 26—two days after informing Plaintiff that she had been terminated—Sparks added a note to the Netprofile entry for Plaintiff's termination.  The note said that Plaintiff was "terminated off the system … and [her] position was filled when she did not return from leave" (Dkt. No. 37-2 at 13).

[14] BBVA does not have a standard policy for notifying an employee on leave that her position has been filled.  In her deposition, Tasha Hardy testified as follows:

> Question: …[H]ow does [BBVA] inform people and when that their position has been filled while they are on leave?

> Answer: When they are ready to return back to work, they can be notified.  They can be notified by the manager.  They can be notified by H.R.  They can [ ] find out from somebody in their department.  There

Advisor at its Mall del Norte Branch in Laredo.  The posting was taken down on January 10 (Dkt. No. 37-2 at 46).  Because Plaintiff did not learn that she had been terminated until after January 10, she did not know to apply for this position (*id.* at 44).

On January 29, BBVA posted an opening for a Financial Service Adviser at its McPherson Branch in Laredo (*id.* at 46–47).  Plaintiff emailed Sparks that she intended to apply for the McPherson position and asked whether she had to follow any special procedures (Dkt. No. 41-27).  Sparks did not respond.  Plaintiff applied for the position on February 10.  BBVA considered her an external candidate and promoted an internal candidate instead (Dkt. Nos. 37-2 at 43–44; 37-3 at 4).[15]  On March 13, BBVA posted another Financial Service Advisor position at the McPherson branch.  Plaintiff applied the next day, but BBVA selected another internal candidate (*id.*).

### F. After filing an EEOC Charge, Plaintiff brings this lawsuit, alleging discrimination on the basis of age and disability.

In June 2018, Plaintiff filed a dual charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission-Civil Rights Division (TWC) (Dkt. No. 37-4 at 46).  The EEOC dismissed Plaintiff's charge and issued a right-to-sue notice (Dkt. No. 37-4 at 48–50).  Plaintiff filed this action on August 29, 2018 (Dkt. No. 1).

---

are a number of ways that an employee can find out for that information

(Dkt. No. 37-2 at 41).

[15] BBVA policy prioritizes current employees over external candidates (Dkt. No. 37-3 at 3).

In her complaint, Plaintiff alleges that BBVA unlawfully discriminated against her because of her age and disability.  Specifically, she asserts age discrimination claims under the Age Discrimination in Employment Act (ADEA) and the Texas Commission on Human Rights Act (TCHRA).  She asserts disability discrimination claims under the Americans with Disabilities Act (ADA) and the TCHRA for (1) terminating her employment because of her disability and (2) failing to provide a reasonable accommodation of her disability (Dkt. No. 1).[16]

BBVA now moves for summary judgment (Dkt. No. 37).  Plaintiff has filed a response (Dkt. No. 41), and BBVA has filed a reply (Dkt. No. 42).

## II. Legal Standard

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material that "might affect the outcome of the suit under governing law," and a fact issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying evidence in the record that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1968).  The burden then shifts to the non-moving party to

---

[16] Claims that an employer subjected an employee to an adverse employment action because of a disability and that an employer failed to reasonably accommodate an employee's disability are distinct violations of the ADA. *Dillard v. City of Austin, Texas*, 837 F.3d 557, 562 (5th Cir. 2016).

"identify specific evidence in the record and articulate the precise manner in which that evidence supports their claim." *Gonzales v. Wells Fargo Bank, Nat'l Ass'n*, 733 F. App'x 795, 797 (5th Cir. 2018) (cleaned up).

The court "must consider both direct and circumstantial evidence but may not make 'credibility assessments,' which are the exclusive province of the trier of fact." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018). Although a non-movant may not rely on "speculation, improbable inferences, or unsubstantiated assertions," the Court must draw all reasonable inferences in the "light most favorable to the party opposing summary judgment." *Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204, 209 (5th Cir. 2019).

## III. ANALYSIS

BBVA raises three preliminary arguments that the Court can dispense with quickly.  It contends that Plaintiff's state-law claims are time-barred because she did not file suit within 60 days of receiving her right-to-sue letter from the EEOC (Dkt. No. 37 at 20).  As Plaintiff correctly responds (Dkt. No. 41 at 11–12), BBVA's argument is foreclosed by *Vielma v. Eureka Co.*, 218 F.3d 458, 464 (5th Cir. 2000).  In *Vielma*, the Fifth Circuit held that while receipt of an EEOC notice triggers the 90-day period to bring a federal discrimination suit, it does not trigger the 60-day period under the TCHRA.  *Id.*[17]  Therefore, Plaintiff's state-law claims are not time-barred.

---

[17] Because Plaintiff did not request a right-to-sue letter from the TWC, which is not required under Texas law, she had two years from the filing of her administrative complaint to bring an action under the TCHRA.  *Vielma*, 218 F.3d at 463; *accord Ledesma v. Allstate Ins. Co.*, 68 S.W.3d 765, 769 (Tex. App. 2001) ("[W]e agree with the conclusion set forth in *Vielma*.").

Next BBVA raises an exhaustion argument, claiming that Plaintiff did "not assert a failure-to-accommodate claim in her [EEOC] Charge, and she only uses that phrase once in her Amended Complaint" (Dkt. No. 37 at 30).   After outlining the circumstances of her termination, Plaintiff's EEOC Charge specifically alleges that BBVA "failed to accommodate" her (Dkt. No. 37-4).   Plaintiff's Amended Complaint similarly alleges that BBVA "fail[ed] to provide Plaintiff with a reasonable accommodation of time off for cancer treatment" (Dkt. No. 11 at 6).   Plaintiff has, therefore, exhausted her failure-to-accommodate claim. *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017) (failure-to-accommodate claim was exhausted where EEOC Charge alleged that plaintiff "requested changes or assistance" which defendant failed to provide).

BBVA also seeks to dismiss Plaintiff's complaint based on evidence uncovered *after* Plaintiff's termination, showing that Plaintiff lied on her job application in 2003 (Dkt. No. 37 at 33).   Because after-acquired evidence of misconduct could not have motivated an employer's decision at the time, such evidence is "simply irrelevant at [the summary judgment] stage of the inquiry." *Patrick v. Ridge*, 394 F.3d 311, 319–20 (5th Cir. 2004).   For an employer to rely on after-acquired evidence as the reason for terminating an employee is "tantamount to offering no reason at all." *Id.*; *King v. Drusina*, 7:17-CV-271, 2018 WL 8805642, at *5 (S.D. Tex. June 15, 2018); *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995).   BBVA's after-acquired-evidence defense is not a basis for summary judgment.

### A. Disability Discrimination Claims

#### 1. Plaintiff has established a genuine issue of fact as to whether she was terminated because of her disability.

Turning to the merits of Plaintiff's disability claims, the ADA "makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of disability.'" *Caldwell v. KHOU-TV*, 850 F.3d 237, 241–42 (5th Cir. 2017) (quoting 42 U.S.C. § 12112(a)).[18]  Where, as in this case, a plaintiff relies on circumstantial evidence of discrimination, she must proceed under the *McDonnell Douglas* burden-shifting framework. *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

First, Plaintiff must establish a *prima facie* case of disability-based discrimination.  This requires her to show that: (1) she had a disability, (2) she was qualified for the job, and (3) there was a causal connection between her disability and her termination.  *Id.* at 765.  Next, the burden shifts to BBVA to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  *Id.*  Finally, the burden returns to Plaintiff to show that a reasonable jury could find BBVA's proffered reason is mere pretext.  *Id.*

As to the first prong of the *prima facie* analysis, BBVA concedes that Plaintiff had a disability within the meaning of the ADA.  *See* 42 U.S.C. § 12102(1).

---

[18] For convenience, the Court will refer only to Plaintiff's ADA claim in place of her TCHRA claim.  *Alviar v. Macy's, Inc.*, 784 F. App'x 213, 216–17 (5th Cir. 2019) ("The [Texas] Legislature intended to correlate state law with federal law in employment discrimination cases.").

### a. Plaintiff was qualified for her job at the time of her termination.

As to the second prong, BBVA contends that Plaintiff was not "qualified" for her position on January 5, the alleged date of her termination.   A plaintiff can establish that she was qualified by showing that at the time of her termination, she could perform the "essential functions of her job" despite her disability or with a reasonable accommodation of her disability.  *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020).   BBVA argues that "being physically present at the bank during business hours" was an essential function of Plaintiff's job; that employees may not return from leave without submitting a doctor's release; and that Plaintiff's doctor did not submit a release until January 8.   BBVA concludes that Plaintiff was not qualified on January 5, because she was not authorized to come to work (Dkt. No. 37 at 22–23).

At the outset, Plaintiff has established a factual issue regarding when she was terminated.   Polnett, who had Plaintiff's name removed from the computer system on January 5, continued to express uncertainty about whether Plaintiff still had her job (Dkt. Nos. 37-6 at 30; 41-23).   On January 8, Gery Hackney "restored" the disputed PCN to Plaintiff until H.R. could "confirm[ ] the next steps" (Dkt. No. 41-14 at 9–10).   And despite her pleas for information, no one informed Plaintiff that she had been terminated until January 24, which could also suggest that her status remained unresolved after January 5.

Even assuming Plaintiff was fired on January 5, BBVA's argument is premised on a category mistake.   BBVA conflates the physical limitations associated with

Plaintiff's disability and its own internal leave policies.  A violation of the bank's policies may be a legitimate reason to terminate an employee.  At this stage, however, the issue is whether Plaintiff's medical disability—not BBVA's administrative policies—prevented her from performing the essential functions of her job.  *See Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) (plaintiffs are not qualified when they are "medically incapable" of performing their job (citing cases)).  On January 3, Plaintiff's doctor submitted a revised certification which listed the following day as the end of Plaintiff's period of incapacity (Dkt. No. 41-8 at 1–4).  Although the doctor did not submit a separate release form until January 8, Plaintiff was nevertheless qualified for her position, within the meaning of the ADA, on January 5.

Alternatively, a plaintiff may demonstrate that she was "qualified" for her position with a reasonable accommodation.  *Clark*, 952 F.3d at 582.  Plaintiff sought an accommodation in the form of extended leave time (Dkt. Nos. 37-5 at 18, 43–46; 41-8 at 1–4).  BBVA argues that Plaintiff's request was not reasonable because "indefinite leave is not a reasonable accommodation" (Dkt. No. 37 at 24).[19]  "Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave."  *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016).  The record demonstrates that if Plaintiff had been given a roughly three-day extension of her leave, she could

---

[19] BBVA does not argue that the additional leave presented an undue hardship.  *See* 42 U.S.C. §§ 12112(b)(5)(A), 12111(10).

have met all of BBVA's requirements to return to work.  While indefinite leave is not a reasonable accommodation, a three-day extension is.  *Reed v. Jefferson Par. Sch. Bd.*, CIV. A. 12-2758, 2014 WL 1978990 (E.D. La. Apr. 24, 2014) (holding that two-week extension following extended medical leave was a reasonable accommodation, and rejecting employer's argument that plaintiff was unqualified because she could not be physically present at work when her leave expired).[20]

BBVA stresses that Plaintiff had been on medical leave for eight months overall and that her extension request was denied as of January 5 (Dkt. No. 37 at 23–24).  But "[r]egardless of whether it could have discharged [Plaintiff] when [her] leave ran out, [BBVA] chose not to do so…. Because it continued to employ [Plaintiff], [BBVA] was obligated under the ADA to reasonably accommodate [her] once [s]he was capable of returning to work."  *Dillard*, 837 F.3d at 562; *Reed*, 2014 WL 1978990, at *3 ("[A] person who seeks reasonable leave remains qualified for a position so long as following the leave they can complete the essential functions of the job."). Therefore, the Court finds that Plaintiff was qualified for her job as of January 5, either despite her disability or with a reasonable accommodation.

---

[20] The cases that BBVA cites are inapposite because they involve requests for indefinite leave or otherwise unreasonable accommodations.  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (accommodation amounted to request for indefinite leave where plaintiff stated that "she would return as soon as she received a release from her doctor, but that she had no idea at that time as to when she would be released, or what her limitations would be"); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (same, where plaintiff was not medically able to work for 11 months after he was terminated); *Hypes v. First Commerce Corp.*, 134 F.3d 721 (5th Cir.1998) (request for flex-time schedule that allowed plaintiff to arrive one to two hours late, even if deemed reasonable, would not enable him to perform his job since he routinely arrived four hours late and missed entire days).

### b. Plaintiff has established a causal connection between her disability and her termination.

As to the third prong of the *prima facie* analysis, BBVA argues that Plaintiff has "no evidence, direct or circumstantial, that she was subjected to any adverse employment action *because* of her ... disability" (Dkt. No. 37 at 19). To the contrary, the timing of Plaintiff's termination strongly supports an inference of discrimination. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) ("The combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment."). On January 3, 2018, Plaintiff's doctor certified that she could return to work the next day. On January 4, Plaintiff informed Cantu that she was ready to come back. Around 8:00 a.m. on January 5, Cantu relayed that information to Gallegos. Seven hours later, Plaintiff was fired. The timing of her termination, on the cusp of her return from medical leave, is circumstantial evidence of discrimination. *See*, *e.g.*, *Cruz v. R2Sonic, LLC*, 405 F. Supp.3d 676, 692 (W.D. Tex. 2019) (finding "an inference of causation" where plaintiff was terminated two and a half months after she returned from medical leave); *Elder v. PDC Logic, LLC*, No. CV H-16-966, 2017 WL 4083605, at *9 (S.D. Tex. Aug. 15, 2017) (same, where plaintiff was terminated "before he took a few days off for dialysis training").

As early as August 2017, moreover, Gallegos and Cantu expressed an interest in terminating Plaintiff's employment in connection with her medical leave. In an email to Tasha Hardy, Gallegos wrote, "The fact that [Cantu] already confirmed [Plaintiff's] FMLA start date, and job protection is exhausted, what do we need to do

to replace her?"  Hardy asked for an email that described how Plaintiff's absence was causing a business hardship, so Cantu sent a draft email to Gallegos before sending the final version to Hardy.  With the other evidence of discrimination and pretext, a reasonable jury could infer from this exchange that Gallegos and Cantu had negative attitudes about Plaintiff's disability and associated medical leave.

Beyond that, the chaotic, even secretive process that resulted in Plaintiff's termination, which is set out above in detail, adds to the inference of discrimination. *Cruz*, 405 F. Supp.3d at 692 (finding evidence of causation where the process that resulted in plaintiff's termination did not otherwise "make sense").  After apparently firing Plaintiff on January 5, Polnett declined to answer direct questions about whether Plaintiff still had a job (Dkt. Nos. 37-6 at 30; 41-23).  Sparks repeatedly forgot or changed her mind about whether Plaintiff could return to work, sometimes writing contradictory emails to the same people within hours (*e.g.* Dkt. Nos. 37-6 at 53; 41-22 at 1; 41-23 41-25; 41-26 at 1).  As a nod to the unusual process in this case, BBVA points out that the ADA protects employees only from discrimination, not from otherwise "unfair, negligent, or improper employment decisions" (Dkt. No. 42 at 16).  While a reasonable jury might agree with BBVA that Plaintiff's termination was due to mistakes and poor communication, it could also conclude that BBVA's conduct around the time of Plaintiff's termination evidences discrimination.

The Court finds that Plaintiff has demonstrated a sufficient causal connection between her disability and her termination.  Therefore, she has established a *prima facie* case of discrimination.

### c. BBVA has proffered a non-discriminatory justification for Plaintiff's termination.

Because Plaintiff has made a *prima facie* showing of an ADA violation, the burden shifts to BBVA to articulate a non-discriminatory reason for Plaintiff's firing. BBVA maintains that Plaintiff was terminated because "she failed to return to work after exhausting her leave." Specifically, BBVA asserts that "Polnett terminated [Plaintiff] for the following reasons: (1) she had been on leave for over 180 days; (2) her requested extension had been denied; and (3) she had been on unapproved leave since November 24, 2017" (Dkt. No. 37 at 25). Plaintiff does not dispute that BBVA has carried its burden to provide a non-discriminatory reason.

### d. Plaintiff has demonstrated a genuine issue of fact as to whether BBVA's proffered justification is pretextual.

The burden now returns to Plaintiff to show that BBVA's proffered reason is pretextual. "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Caldwell*, 850 F.3d at 242. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* "In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of material fact regarding pretext." *Id.*

BBVA maintains that Plaintiff was terminated because her extension request was denied as of January 5, and she had been on leave for over 180 days. Yet a week before BBVA informed Plaintiff that she had been terminated, ADP retroactively approved her leave. The record shows that ADP is authorized to approve leave

requests retroactively.  Since BBVA's reason for terminating Plaintiff—unapproved leave—was no longer true by the time Plaintiff was informed of her termination, a reasonable jury could infer that BBVA's proffered explanation was pretextual.

BBVA tries to rebut this inference in its reply brief.  It argues, somewhat disingenuously, that ADP is a "totally separate company" not even "affiliated with BBVA" (Dkt. No. 42 at 13).  While ADP may be a separate company, the record shows that if a leave request is approved by ADP, it is also approved by BBVA, and BBVA employees can rely on a decision by ADP "just the same as if it came directly from the bank" (Dkt. No. 37-2 at 7).  It is ironic that BBVA tries to disclaim responsibility for ADP's retroactive approval, given that it relies on ADP's preliminary denial to justify Plaintiff's termination.

Plaintiff also has shown genuine issues of fact regarding BBVA's alleged policy of terminating employees on leave for 180 days.  In her deposition, for instance, Polnett could not identify where the 180-day policy was written down or how it was communicated to employees.  Polnett also could not remember why she chose January 5 to remove Plaintiff's name from the system or clearly explain why Plaintiff was not terminated for two months after she reached the 180-day benchmark.

Indeed, Polnett testified inconsistently about the scope of the 180-day policy. She first testified as follows.

> Question: [I]t's your testimony that [BBVA] has a policy that an employee who is out for 180 days will be … will be terminated?
>
> Answer: Correct.
>
> . . . .

> Question: Are there any exceptions to that policy?
>
> Answer: No

(Dkt. No. 37-2 at 11–12).  Later, Polnett explained the policy differently.

> Question: [I]f on day 170 an employee submits documentation saying that on day 200 they would be able to return to work, what would happen then?
>
> Answer: That would go to … H.R. … to make the determination.
>
> Question: So there [are] maybe some … limited circumstances where the 180 days isn't black and white?
>
> Answer: Yes.

(Dkt. No. 37-2 at 17).  Based on these omissions and inconsistencies, a reasonable jury could find that BBVA's reliance on its ill-defined 180-day policy is mere pretext.[21]

BBVA has also sought to justify Plaintiff's termination in materially different ways at different times.  *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 n.11 (5th Cir. 2007) ("[A]n employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual.").  On summary judgment, BBVA maintains that Plaintiff was terminated only for violating the bank's leave policies.  But it previously represented that Plaintiff was terminated because Carbajal had replaced her.

Sparks told Plaintiff that she had been terminated because her "position was filled," without any mention of a 180-day policy or a failure to return from leave.  In

---

[21] The employee handbook generally does not contemplate automatic terminations.  In a section on FMLA leave, for instance, the handbook states, "Failure to furnish appropriate certification within 15 days of request, *unless not practicable under the circumstances*, may result in leave denial and the resulting loss of FMLA protections and/or disciplinary action *until proper certification is provided*" (Dkt. No. 37-4 at 34–35 (emphases added)).

an email to Christy Velez, Sparks confirmed that, according to Cantu, Plaintiff's position was filled while she was on leave.  In his own deposition, however, Cantu testified that he did not believe Carbajal had permanently replaced Plaintiff.  Sparks also updated the Netprofile entry that documented Plaintiff's termination to reflect that her position had been filled.  A jury could reasonably infer from BBVA's shifting explanations a "desire to discharge [Plaintiff] however possible."  *See E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 624 (5th Cir. 2009).

This discrepancy is also significant because if Plaintiff's position was filled while she was on leave, BBVA policy gives her 30 days to find another position before her employment will be terminated.  A reasonable jury could find that by waiting several weeks to inform Plaintiff that she had been fired, BBVA deliberately limited Plaintiff's window to apply for other jobs.  It could also find that by treating Plaintiff as an external candidate when she applied for other positions, BBVA was motivated by a discriminatory animus to violate its own policy.[22]  Accordingly, Plaintiff has shown a genuine issue of fact as to whether BBVA's proffered justification is pretextual.[23]

---

[22] Moreover, because an employee whose job is filled is not terminated for 30 days after her return date, BBVA's apparent reliance on this explanation further calls into question the date of Plaintiff's termination.

[23] BBVA changes tack in its reply brief and insists that the only "facts material and relevant to this lawsuit are those that Polnett (the decisionmaker) knew at the time she made the termination decision" (Dkt. No. 42 at 10–11).  Both the logic of this argument, and the cases cited for it, are drawn from the retaliation context.  *See, e.g.*, *Yancy v. U.S. Airways, Inc.*, 469 F. App'x 339, 344 (5th Cir. 2012) ("In evaluating a Title VII retaliation claim, we look to who actually made the decision or caused the decision to be made." (cleaned up)).  Outside the retaliation context, the Fifth Circuit has "not adhered to a bright-line rule that only the decision-maker's statements can be considered when determining whether a plaintiff has presented sufficient evidence of pretext."  *Caldwell*, 850 F.3d at 243 n.5.  Rather, courts consider a variety of factors, including "inconsistent statements made by an employer and its representatives to the EEOC and to the court."  *Id.*  Thus, evidence showing the

\*           \*           \*

Plaintiff has established a *prima facie* case of discrimination and demonstrated substantial evidence of pretext.   "No further evidence of discriminatory animus is required because once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).   Summary judgment on Plaintiff's discriminatory termination claim is denied.

### 2. Plaintiff has established a genuine issue of fact as to whether BBVA failed to reasonably accommodate her disability.

BBVA also moves for summary judgment on Plaintiff's failure-to-accommodate claim.  As defined by the ADA, "discrimination on the basis of disability" includes an employer's failure to make "reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability."   42 U.S.C. § 12112(b)(5)(A).  To recover on a failure to accommodate claim, a plaintiff must prove that: (1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered  employer; and (3) the employer failed to make reasonable accommodations for such known limitations. *Feist v. La., Dept. of Justice, Office of the Attorney General*, 730 F.3d 450, 452 (5th Cir. 2013).

An employee has the initial responsibility to inform her employer of the need for a medically related accommodation. *E.E.O.C. v. Chevron Phillips Chem. Co., LP*,

---

employer's justification is not true, together with the plaintiff's *prima facie* case, is "likely to support an inference of discrimination even without further evidence of [the employer's] true motive." *Gill v. DIRTT Envtl. Sols., Inc.*, 790 F. App'x 601, 604 (5th Cir. 2019).  While Polnett may have known on January 5 that Plaintiff was in the process of returning to work, the Court's analysis is not so limited.

570 F.3d 606, 621 (5th Cir. 2009).  "Once an employee makes such a request, however, the employer is obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability." *Grant v. Harris Cty.*, 794 F. App'x 352, 360 (5th Cir. 2019).  Although an employer is not liable for a breakdown in the interactive process "traceable to the employee," an employer that "fails to engage in the interactive process in good faith violates the ADA." *Delaval*, 824 F.3d at 481.

The Court has already found that Plaintiff was a qualified individual with a disability who requested a reasonable accommodation in the form of a short extension of her leave.  Yet BBVA argues that because Plaintiff's doctor had to submit corrected paperwork after January 5, Plaintiff did not "properly" request an accommodation until after she was fired (Dkt. Nos. 37 at 31).  Again, BBVA conflates its company policies with federal discrimination law.  A request need not take any particular form so long as the employee explains that the accommodation is "for a medical condition-related reason." *Chevron Phillips Chem. Co.*, 570 F.3d at 621; *see also Delaval*, 824 F.3d at 481.  Starting in November 2017, Plaintiff repeatedly advised BBVA that she could return to work in early January, which her doctor confirmed in multiple certifications.  Thus, BBVA was aware that while Plaintiff needed some additional time off, she was in the process of shortly returning to work. *E.E.O.C. v. Vicksburg Healthcare, L.L.C.*, 663 F. App'x 331, 335 (5th Cir. 2016) (plaintiff requested accommodation when she "presented doctor's certifications clearing her to work with restrictions"); *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108 (5th Cir.

2005) (by informing employer that she had met with rehabilitation counselor and intended to return to work, even without identifying specific accommodation, plaintiff triggered employer's obligation to participate in interactive process).

By requesting an accommodation, Plaintiff obligated BBVA to engage in an interactive process. But a reasonable jury could find that BBVA "stymie[d] the interactive process … by preemptively terminating the employee before an accommodation [could] be considered." *Cutrera*, 429 F.3d at 113. Accordingly, summary judgment on Plaintiff's failure-to-accommodate claim is denied.[24]

## B. Age Discrimination Claims

BBVA argues that Plaintiff abandoned her age discrimination claim in her response brief, and therefore seeks summary judgment (Dkt. No. 42 at 8). Like ADA claims, ADEA claims based on circumstantial evidence proceed under the *McDonnell Douglas* burden-shifting framework. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). If the plaintiff establishes a *prima facie* case and the defendant proffers a non-discriminatory alternative, the plaintiff must meet her "ultimate burden of persuasion on the issue of intentional discrimination." *Id*. This requires

---

[24] BBVA alternatively seeks partial summary judgment on its affirmative defense that Plaintiff failed to mitigate her damages (Dkt. No. 37 at 32). Whether an injured party has mitigated damages is generally a question for the jury because it "requires a factual assessment of the reasonableness of [the plaintiff's] conduct." *Smith v. Huntington Ingalls Inc.*, 363 F. Supp.3d 711, 721 (S.D. Miss. 2019) (quoting *Hill v. City of Pontotoc, Miss.*, 993 F.2d 422, 427 (5th Cir. 1993)). Plaintiff applied for nine other positions since her termination (Dkt. No. 37 at 33). She has also presented evidence that additional mitigation would have been futile or was otherwise excusable (Dkt. No. 41 at 25). Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could find that she adequately mitigated her damages. *Hill*, 993 F.2d at 426 (holding that mitigation was properly a jury question where plaintiff "applied for only two positions during the two years after his termination"). Partial summary judgment on the issue of damages is denied.

her to "prove by a preponderance of the evidence … that age was the 'but-for' cause" of her termination.  *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

The only substantive reference in Plaintiff's response brief to her age discrimination claim comes in a short footnote where Plaintiff points out that she was replaced by someone younger than her (Dkt. No. 41 at 19 n.8).  Arguments relegated to a footnote are "insufficiently addressed in the body of the brief and are therefore waived."  *Delaval*, 824 F.3d at 479; *United States v. Stevens*, 487 F.3d 232, 242 n.1 (5th Cir. 2007) ("Inadequately briefed issues are deemed abandoned.").  While Plaintiff has established the elements of a *prima facie* case, she has not briefed any arguments, presented any evidence, or cited any legal authority to satisfy her ultimate burden of proving that age was a but-for cause of her termination.  Thus, BBVA is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, BBVA's motion for summary judgment (Dkt. No. 37) is **GRANTED in part and DENIED in part**.  The motion is **GRANTED** with respect to Plaintiff's state and federal age discrimination claims, which are **DISMISSED** with prejudice.  The motion is **DENIED** with respect to Plaintiff's state and federal disability discrimination claims, which will proceed to trial.

It is so **ORDERED**.

**SIGNED** May 7, 2020.

Marina Garcia Marmolejo
United States District Judge

28